HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

EDMUND OBERTI,

          Plaintiff,

  v.

PACIFIC MARITIME ASSOCIATION, et al.

          Defendants.

CASE NO. C13-1580 RAJ

ORDER

## I. INTRODUCTION

This matter comes before the court on defendant Pacific Maritime Association's ("PMA") motion for summary judgment. Dkt. # 36. Plaintiff, Edmund Oberti ("Mr. Oberti"), is a longshoreman. He alleges that his employer, PMA, and his union, defendant International Longshoreman's & Warehouse's Union Local 19 ("the Union") discriminated against him because of his disability.

On February 19, 2014, plaintiff and the Union entered into a stipulation, which dismissed all claims against the Union. Thus, only the claims against PMA remain. Plaintiff alleges: (1) disability discrimination and failure to accommodate in violation of RCW 49.60, (2) retaliation in violation of RCW 49.60, (3) hostile work environment, (4)

wrongful termination, (5) intentional infliction of emotional distress and (6) negligent infliction of emotional distress. For the reasons stated below the motion is GRANTED IN PART AND DENIED IN PART.

## II.   BACKGROUND

Plaintiff Edmund Oberti was a "Casual" non-registered longshoreman. (Starkey Decl.) Dkt. # 37, ¶ 3.[1] In July of 2007, three years before the incident at issue in this case, Mr. Oberti tested positive for drugs and his dispatch privileges were suspended. *Id.*, p. 33. Because he was still a trainee at that time, he was given an opportunity to retest 30 days later. *Id.*, 12. He passed and was reinstated. *Id.*, p. 36.

The incident at issue here occurred on Saturday, August 7, 2010. PMA scheduled Mr. Oberti for a drug test as part of a possible promotion to a Class B "registered" longshoreman. He was told, prior to the drug test, that the clinician would need to observe him producing the specimen. (Oberti Dep.) Dkt. # 40, p. 7. He attempted to produce a specimen multiple times throughout the day. The clinician recalls at least three attempts. (Brandt Decl.) Dkt. # 38, p. ¶3.[2] Mr. Oberti recalls at least eight attempts. (Oberti Decl.) Dkt. # 43, ¶ 21.

Ultimately, he produced two urine specimens. (Brandt Decl.) Dkt. # 38, p. 5; (Oberti Decl.) Dkt. # 43, ¶ 8, 13-16. During one attempt, Mr. Oberti produced a urine sample, but the clinician was not in the room, so it was discarded. (Brandt Decl.) Dkt. # 38, p. 5; (Oberti Decl.) Dkt. # 43, ¶ 8. During another attempt, the clinician was present, but Mr. Oberti was seated while producing the sample. The parties disagree as to the reasons why this second sample was unusable. Mr. Oberti claims that the clinician

---

[1] Ms. Sandra Starkey acted as the employer's representative and communicated with the clinic that tested Mr. Oberti for drugs and alcohol. Ms. Starkey was not physically present at the clinic when Mr. Oberti was tested.

[2] Trevor Brandt was the clinician who attempted to observe and collect a urine sample from Mr. Oberti.

observed him provide the sample, but "[a]fter trying as hard as possible, [he] was only able to give a few drops." Thus, Mr. Oberti contends that the clinician discarded the sample because the amount of urine was insufficient. (Oberti Decl.) Dkt. # 43, ¶ 15-16. The clinician claims, however, that the sample was unusable because he could not fully view Mr. Oberti providing the sample and that he actually saw something white dangling under Mr. Oberti's genitals. (Brandt Decl.) Dkt. # 38, p. 5. When the clinician asked Mr. Oberti to stand up, he was "not able to visualize anything." *Id.* Mr. Oberti recalls this incident and confirms that he allowed the clinician to take a second look, but that the clinician did not see anything dangling between his legs. (Oberti Decl.) Dkt. # 43, ¶ 17. Mr. Oberti was then placed on the Department of Transportation's "shy bladder" protocol ("DOT protocol"). (Brandt Decl.) Dkt. # 38, p. 5. Pursuant to that protocol, Mr. Oberti was given up to 40 ounces of liquid to drink during a three hour period. (Starkey Decl.) Dkt. # 37, ¶ 9; Dkt. # 43, ¶ 20. At the conclusion of the three hour period, Mr. Oberti still failed to produce a urine sample. (Brandt Decl.) Dkt. # 38, p. 5. The clinic manager ultimately reported the collection as a "refusal" based on the DOT protocol. (Starkey Decl.) Dkt. #37, p. 8; (Shibata Decl.) Dkt. # 39, p. 5.[3]

Later that evening, Mr. Oberti called the after-hours triage nurse at his doctor's office and complained that he was having trouble urinating. (Nurse Report) Dkt. # 42-1, p. 15. The nurse recommended that Mr. Oberti go to the Emergency Department. *Id.* On Monday August 9, 2010, Mr. Oberti was seen by his doctor, Dr. T. Vyn Reese, M.D. (Medical Records) Dkt. # 42-1, pp. 17-21. Dr. Reese diagnosed Mr. Oberti with urinary hesitancy due to "an acute anxiety attack when he was forced to urinate before a male observer." Dr. Reese prescribed anxiety medication and recommended that Mr. Oberti "repeat the test with the anxiolytic or without a male observer." *Id.* Mr. Oberti later

---

[3] Mayumi Shibata was the manager of the clinic where Mr. Oberti attempted to provide a urine sample.

ORDER- 3

testified that he had never before experienced this type of anxiety prior to this incident and has not experienced it since. (Oberti Dep.) Dkt. # 40, p. 9.

Mr. Oberti provided PMA and his union with Dr. Reese's letters on or before August 11, 2010. (Starkey Decl.) Dkt. # 37, p. 8. On August 18, 2010, Mr. Oberti's dispatch privileges were suspended and he was permanently removed from the industry. (Starkey Decl.) Dkt. # 37, p. 12.

Two other longshoremen were removed from the industry that same day. One was removed because he tested positive for drugs and the other was removed because he attempted to provide a false specimen. (Starkey Decl.) Dkt. #37, ¶ 13, pp. 41-49. In the latter case, a clinician actually saw a container of urine taped under the patient's genitals and saw him pouring it into the cup. *Id.*, p. 47.

## III.  LEGAL STANDARD

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the non-moving party's case. *Celotex Corp.*, 477 U.S. at 325. If the moving party meets the initial burden, the opposing party must set forth specific facts showing that there is a genuine issue of fact for trial in order to defeat the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

The court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150-51 (2000). Credibility determinations and the weighing of the evidence are jury functions, not those of a judge. *Anderson*, 477 U.S. at 255. For purposes of summary judgment, the evidence of the non-movant is to be

believed, and all justifiable inferences are to be drawn in his favor. *Id.* (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970)).

## IV. ANALYSIS

### a. Plaintiff's Reasonable Accommodation Claim

"To eliminate discrimination in the workplace, state law requires employers to reasonably accommodate a disabled employee unless the accommodation would be an undue hardship on the employer." *Riehl v. Foodmaker, Inc.*, 152 Wash. 2d 138, 145 (2004). To establish a prima facie case for failure to accommodate an employee's disability, the employee must show that he or she (1) had a sensory, mental, or physical abnormality that substantially limited his or her ability to perform the job; (2) was qualified to perform the essential functions of the job with or without reasonable accommodation; (3) gave the employer notice of the disability and its accompanying substantial limitations; and (4) after notice was given, the employer failed to adopt measures that were medically necessary to accommodate the disability. If the plaintiff cannot establish a prima facie case, the defendant is entitled to judgment as a matter of law. *Hill v. BCTI Income Fund–I,* 144 Wash. 2d 172, 182 (2001), *overruled in part on other grounds by McClarty v. Totem Elec.,* 157 Wash. 2d 214 (2006).

Under Washington law, "disability" means the presence of a sensory, mental, or physical impairment that:

> Is medically cognizable or diagnosable; or (ii) Exists as a record or history; or (iii) Is perceived to exist whether or not it exists in fact. RCW 49.60.404(7)(a). A disability exists whether it is temporary or permanent, common or uncommon, mitigated or unmitigated, or whether or not it limits the ability to work generally or work at a particular job or whether or not it limits any other activity within the scope of this chapter.

RCW 49.60.404(7)(b).

ORDER- 5

Additionally, for the purposes of qualifying for reasonable accommodation in employment:

> [A]n impairment must be known or shown through an interactive process to exist in fact and the impairment must have a substantially limiting effect upon the individual's ability to perform his or her job, the individual's ability to apply or be considered for a job, or the individual's access to equal benefits, privileges, or terms or conditions of employment.

RCW 49.60.040(7)(d)(i).

Although several courts have found that "shy bladder" syndrome is not a disability under the federal Americans with Disabilities Act ("ADA"), Washington law defines "disability" in much broader terms and provides Washington residents with additional protections. *Compare Terbush v. Massachusetts*, 987 F. Supp. 2d 109, 122 (D. Mass 2013) (finding that "shy bladder" syndrome is not a disability under the ADA), w*ith Hale v. Wellpinit School Dist. No. 49*, 165 Wash. 2d 494, 501-02 (2009) (en banc) (acknowledging that the Washington legislature specifically intended to employ a broader definition of "disability" and that "the [Washington] Law Against Discrimination affords state residents protections that are wholly independent of those afforded by the federal Americans with Disabilities Act…").

Here, plaintiff has submitted sufficient evidence to show that "shy bladder" syndrome is medically diagnosable and had a substantially limiting effect on his ability to apply or be considered for a Class B longshoreman position. He provided letters from his physician as well as a record of his conversation with the triage nurse, both of which support his contention that he had a medical condition that may have prevented him from providing a urine sample. Without a "passing" urine sample (i.e., a negative sample that was observed by the clinician), he could neither become a Class B longshoreman nor continue in the industry. There is no evidence that suggests Mr. Oberti was not otherwise qualified to perform his job.

The record also contains evidence that shows PMA had notice of the alleged disability on or before August 11, 2010 and that Mr. Oberti was terminated on August 18, 2010. PMA concedes that it did not engage in an interactive process and it did not provide Mr. Oberti with any accommodation. (PMA Reply) Dkt. # 45, p. 1.

PMA does not bother to poke holes in plaintiff's evidence or submit contrary evidence. It simply asserts that "even if" Mr. Oberti had a disability, that is irrelevant because he did not fail the test due to an inability to produce a urine sample, but rather because he cheated. Specifically, PMA argues that "Mr. Oberti tried to evade observation and produce a clean specimen that he had smuggled in with him." (PMA Mot.) Dkt. # 36, p. 5. PMA fails, however, produces no evidence to support this contention.

With respect to the first urine sample, the clinician's report states that Mr. Oberti produced the sample while the clinician was not in the room, but nothing in the report implies that Mr. Oberti did so with the intent to evade observation. A reasonable jury could find that because of his "shy bladder" syndrome, he was unable to produce a sample until the clinician left the room. Although Mr. Oberti testified that he had never before experienced this type of anxiety prior to this incident and has not experienced it since, that does not lead to the automatic conclusion that he cheated on the drug test. It certainly causes the court to doubt his version of events, but at the summary judgment stage the court cannot weigh the evidence and make credibility determinations. *See Anderson*, 477 U.S. at 255 (credibility determinations and the weighing of the evidence are jury functions, not those of a judge).[4] Mr. Oberti has presented the professional

---

[4] Additionally, it appears as if PMA is inviting the court to conclude that Mr. Oberti is lying because he previously failed a drug test three years earlier and two other longshoremen were dismissed on the same day for cheating. The court declines to draw such conclusions and, in any event, is not permitted to do so at this stage. *Anderson*, 477 U.S. at 255. Further, the dismissals of the two other longshoremen are entirely distinguishable from this case; one tested

ORDER- 7

1  opinion of a medical doctor and PMA has done nothing to impeach that evidence.  For
2  example, PMA has not shown that the letters were forgeries or that Dr. Reese was lying
3  or somehow in cahoots with plaintiff.  Accordingly, this evidence creates a genuine issue
4  for trial.

5        Similarly, with respect to the second urine sample, the clinician stated that he saw
6  something white dangling under Mr. Oberti's genitals, but that he was "not able to
7  visualize" anything when Mr. Oberti stood up.  If the clinician was certain at that point
8  that Mr. Oberti had "smuggled in" a clean urine sample, then one would think the
9  clinician would have reported it to his supervisors and Mr. Oberti's drug test would have
10 been terminated on the spot.  At the very least, one would think the clinician would have
11 performed a closer exam to confirm or refute his suspicion.  But that is not what
12 occurred.  The clinician then placed Mr. Oberti into a three-hour "shy bladder" protocol
13 and gave him another opportunity to produce a urine sample.  Additionally, Mr. Oberti
14 disputes the clinician's stated reason for discarding the second urine sample.  According
15 to the clinician, it was discarded because he could not fully observe Mr. Oberti producing
16 the sample.  Mr. Oberti contends, however, that the sample was discarded because he
17 could produce "only a few drops" despite his efforts to provide a full cup.  Mr. Oberti's
18 version of events, if believed, is consistent with his alleged disability.  It is entirely
19 possible that because he was being observed, he was not able to produce a sufficient
20 sample of urine.  Again, it is not the court's place to make this determination; this is an
21 issue of fact for the jury.  *Anderson*, 477 U.S. at 255 ("For purposes of summary
22 judgment, the evidence of the non-movant is to be believed, and all justifiable inferences
23 are to be drawn in his favor.").

---

positive and attempted to "buy off" the clinician and the other was caught red-handed with a smuggled-in urine specimen.  Dkt. # 37, pp. 41-49.

Accordingly, PMA has failed to meet its burden of demonstrating the absence of a genuine issue of material fact with respect to plaintiff's reasonable accommodation claim.

### i. PMA's Other Reasonable Accommodation Arguments

PMA raises two additional arguments which it contends dispose of plaintiff's reasonable accommodation claim: (1) the decision to terminate plaintiff, was based upon PMA's reasonable belief that plaintiff was attempting to cheat, rather than any discriminatory motive, and (2) the clinic followed the DOT "shy bladder" protocol and thus there was no further need for an accommodation.

PMA's first argument fails because the lack of a discriminatory motive is not relevant to a reasonable accommodation claim. *See, e.g.*, *Riehl*, 152 Wash. 2d at 145 (explaining difference between reasonable accommodation and disparate treatment claims); *see also Santos v. Washington*, 177 Wash. App. 1030 n. 18 (2013) ("An accommodation claim does not require an employee to show less favorable treatment or discriminatory motive or intent on the part of the employer.").

PMA's second argument fails because PMA has not shown that the DOT regulations are applicable to longshoremen. At least two other courts have granted summary judgment based upon facts similar to the case at hand, but in those cases compliance with the DOT regulations provided a complete defense to any ADA claim. *See, e.g.*, *Jones v. Con-Way Freight, Inc.*, 2014 WL 1120062, at * 5 (W.D.N.C. Mar. 20, 2014); *Melman v. Metro. Gov't of Nashville*, 2010 WL 3063805 (M.D. Tenn. Aug. 3, 2010). In *Jones*, for example, the court reasoned that the employer was required to follow the very specific DOT regulations, which prohibited drug testing by any other means other than urine sample and allowed clinicians to document the test as a "refusal" when a patient failed to produce a sample within three hours. An employer subject to those regulations simply was not permitted to provide other types of "reasonable accommodations." *Jones*, 2014 WL 1120062, at *5. Here, PMA fails to show that it was

bound by DOT regulations and that it could not provide any other type of accommodation.

### b. Plaintiff's Remaining Claims

PMA also moves for summary judgment on plaintiff's remaining claims: retaliation in violation of RCW 49.60, hostile work environment, wrongful termination, intentional infliction of emotional distress and negligent infliction of emotional distress. To the extent plaintiff alleges a disparate treatment claim, PMA moves for summary judgment of that claim as well.

The court finds that PMA has satisfied its burden of showing that "there is an absence of evidence to support the non-moving party's case." *Celotex Corp.*, 477 U.S. at 325. While plaintiff, conversely, has not set forth any specific facts showing that there is a genuine issue for trial regarding any of these claims.

There is simply no evidence in the record that suggests PMA retaliated against plaintiff for any "protected activity," such as making a discrimination complaint in a grievance or an EEOC charge. Rather, the evidence suggests that PMA (1) believed that plaintiff had cheated (2) simply did not believe the medical records or doctor's letters provided by plaintiff or (3) believed that the clinic's compliance with the DOT protocol legally justified PMA's decision to terminate plaintiff. Plaintiff has not produced any evidence to the contrary and thus failed to satisfy his burden.

For these same reasons, plaintiff's disparate treatment claim (to the extent that he alleges such a claim) fails. To prevail on such a claim, plaintiff would have to show that PMA knew plaintiff had a bladder condition and did not want to employ people with such a disability. *See, e.g.*, *Riehl*, 152 Wash. 2d at 145 (disparate treatment claim requires showing of discriminatory intent). There is simply no evidence that PMA acted with the requisite discriminatory intent and the court finds it especially unlikely when PMA was not even aware of plaintiff's diagnosis on the day that he was tested. Plaintiff has

presented no facts to the contrary and offers only conclusory assertions to support this claim.

The remainder of plaintiff's claims -- hostile work environment, intentional infliction of emotional distress and negligent infliction of emotional distress – are not specifically alleged against PMA. (Compl.) Dkt. # 1.1. Indeed, plaintiff testified that conduct by the union formed the basis for these claims. (Oberti Dep.) Dkt. # 40, pp. 10-12. In his opposition, plaintiff does not explain his testimony or otherwise attempt to present facts showing that there is a triable issue as to PMA. His sole argument with respect to these claims is contained in a footnote, which asserts that he has addressed these claims "in this motion." He does not, however, direct the court to any specific section of his opposition or otherwise identify the basis for his opposition.

Accordingly, the court finds that plaintiff has not set forth any specific facts showing that there is a genuine issue for trial regarding any of these claims.

## V. CONCLUSION

For the foregoing reasons, PMA's motion for summary judgment is GRANTED IN PART AND DENIED IN PART. PMA's motion is granted with respect to plaintiff's claims for retaliation, hostile work environment, wrongful termination, intentional infliction of emotional distress and negligent infliction of emotional distress. PMA's motion is denied with respect to plaintiff's claim for reasonable accommodation. The court will set a new trial date and pretrial deadlines in a separate order.

Dated this 27th day of March, 2015.

*Richard A. Jones*
The Honorable Richard A. Jones
United States District Judge